Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

FILED
CLERK U.S DISTRICT COURT

SEP 1 3 2005

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION          BY DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| WESTWAYS WORLD TRAVEL, INC., and SUNDANCE TRAVEL SERVICE, <br><br> Plaintiffs, <br><br> v. <br><br> AMR CORPORATION, AMERICAN AIRLINES, INC., AMERICAN EAGLE HOLDING CORPORATION, and SABRE INC., <br><br> Defendants. | CASE NO. EDCV 99-386 RT (SGLx) <br><br> ORDER GRANTING DEFENDANTS AMERICAN AIRLINES, INC.'S, AMR CORPORATION'S, AND AMERICAN EAGLE HOLDING CORPORATION'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56(c). |

   The court, Judge Robert J. Timlin, has read and considered defendant American Airlines, Inc. ("American")'s motion for summary judgment pursuant to Federal Rules of Civil Procedure, Rule 56(c) ("Rule 56(c)"), Plaintiffs Westways World Travel, Inc. ("Westways") and Sundance Travel Service ("Sundance") (collectively, "Plaintiffs")' opposition, and American's reply. Defendants AMR Corporation ("AMR") and American Eagle Holding Corporation ("American Eagle") join defendant American (collectively, "Moving Defendants") in making this motion.[1] Based on such consideration, the court concludes as follows:

\\\

DOCKETED ON CM

SEP 14 2005

BY ___ 044

---

[1] Defendant Sabre, Inc. ("Sabre") filed a separate motion for summary judgment. Moving Defendants and Sabre will be collectively referred to as "Defendants" herein.

1

320

# I.

## BACKGROUND

Plaintiffs are two travel agents claiming that Defendants engaged in a scheme to charge Plaintiffs monetary penalties for ticketing violations (hidden city ticketing, back-to-back ticketing, and throwaway ticketing) committed by airline passengers who purchased tickets from them.  In Plaintiffs' Second Amended Complaint ("SAC"), they allege that (1) American violated the Racketeering Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c) ("Section 1962(c)"); (2) Defendants aided and abetted violations of Section 1962(c); (3) American was liable for violations of Section 1962(c) under a respondeat superior theory; (4) Defendants conspired to violate Section 1962(c) in violation of 18 U.S.C. § 1962(d) ("Section 1962(d)"); (5) American and American Eagle committed breach of contract; (6) Moving Defendants were unjustly enriched; and (7) Plaintiffs are entitled to injunctive and declaratory relief against Defendants.

On July 9, 2003, this court certified Plaintiffs' action as a class action on behalf of all travel agencies allegedly penalized by Defendants' wrongful conduct, pursuant to Federal Rules of Civil Procedure, Rules 23(b)(2) and 23(b)(3).  Westways World Travel, Inc. v. AMR Corp., 218 F.R.D. 223 (C.D. Cal. 2003).  Defendants subsequently filed a motion to decertify class, which the court granted on February 24, 2005.

Moving Defendants filed the instant motion for summary judgment.

# II.

## JUDICIAL NOTICE

**A.    Plaintiffs' Request for Judicial Notice**

Plaintiffs request that this court take judicial notice of:

(1)    American's Securities Exchange Commission ("SEC") Form 10-K for the fiscal year ending on December 31, 1993;

(2)    American's SEC Form 10-K for the fiscal year ending on December 31, 1994;

(3)    American's SEC Form 10-K for the fiscal year ending on December 31, 1996; and

(4)    American's SEC Form 10-K for the fiscal year ending on December 31, 2000.

Moving Defendants did not file an opposition to Plaintiffs' request for judicial notice.  The

1  court will grant Plaintiffs' request for judicial notice of documents (1) through (4).  See Fed. R.

2  Evid. 201 ("Rule 201"); In re Syncor Int'l Corp. Sec. Litig., 327 F. Supp. 2d 1149, 1156-57 (C.D.

3  Cal. 2004) (taking judicial notice of SEC Form 10-K); In re Adaptive Broadband Sec. Litig., 2002

4  WL 989478, at *9 (N.D. Cal. Apr. 2, 2002) (same).

5  **B.     Moving Defendants' Request for Judicial Notice**

6       Moving Defendants request that the court take judicial notice of:

7       (1)    a United States General Accounting Office ("GAO") report entitled Aviation

8              Competition:  Restricting Airline Ticketing Rules Unlikely to Help Customers,

9              GAO-01-831 (July 23, 2001);

10      (2)    Memorandum and Order Granting Defendant's Motion for Summary Judgment in

11             News Travels, Inc. v. American Airlines, Inc., Civ. No. 97-12762-DPW (D. Mass.

12             Sept. 1, 1999);

13      (3)    Tentative Ruling on Preliminary Injunction in All Direct Travel Servs., Inc. v. Delta

14             Airlines, Inc., SA CV 01-902 AHS (C.D. Cal. Apr. 14, 2003);

15      (4)    Order (1) Overruling in Part and Sustaining in Part Parties' Evidentiary Objections;

16             and (2) Issuing Defendant's Proposed Statement of Uncontroverted Facts and

17             Conclusions of Law, and Order Granting Defendant Delta Airlines, Inc.'s Motion

18             for Summary Judgment in All Direct Travel Servs., Inc. v. Delta Airlines, Inc., SA

19             CV 01-902 AHS (C.D. Cal. Apr. 14, 2003);

20      (5)    Delta Airlines, Inc.'s Statement of Undisputed Facts and Conclusions of Law in

21             Support of its Motion for Summary Judgment in All Direct Travel Servs., Inc. v.

22             Delta Airlines, Inc., SA CV 01-902 AHS (C.D. Cal. Apr. 14, 2003);

23      (6)    Criminal Information in United States v. Startel Corporation, Crim. No. 398-CR-

24             287-T (N.D. Tex. Aug. 26, 1998);

25      (7)    Douglas W. Nelms, Stealing Seats (Airline Ticket Fraud), Air Transport World,

26             Mar. 1, 1994;

27      (8)    Playing by the Rules:  The Ticketing Dilemma, Travel Weekly, June 13, 1994;

28      (9)    Bruce Black, Agency Ethics:  A Prickly Dilemma, Travel Weekly, Mar. 8, 1993;

1      (10)   Eric Gillin, <u>Airlines Set to Crack Down on 'Creative' Ticketing</u>, June 21, 2002; and

2      (11)   <u>Travel Agent's Guide: Back to Back Ticketing</u>, The Airfare Report, Inc., June 1997.

3   Plaintiffs filed an opposition to Moving Defendants' request for judicial notice, and Moving

4   Defendants filed a reply.

5          Pursuant to Rule 201, a district court may take judicial notice of the reports of

6   administrative agencies, <u>Barron v. Reich</u>, 13 F.3d 1370, 1377 (9th Cir. 1994), published and

7   unpublished district court orders, <u>Wendt v. Smith</u>, 273 F. Supp. 2d 1078, 1082 (C.D. Cal. 2003),

8   <u>DeMarco v. DepoTech Corp.</u>, 149 F. Supp. 2d 1212, 1217-18 (S.D. Cal. 2001), court submissions,

9   <u>United States v. S. Cal. Edison Co.</u>, 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004), documents in a

10  court's criminal docket, <u>Quintana v. Gates</u>, 2004 WL 1661540, at *2 n.1 (C.D. Cal. July 20, 2004),

11  and news and trade publication articles, <u>Ritter v. Hughes Aircraft Co.</u>, 58 F.3d 454, 458 (9th Cir.

12  1995), <u>In re Prudential Ins. Co. of Am. Sales Practices Litig.</u>, 148 F.3d 283, 327 (3d Cir. 1998).

13  Where, as here, the contents of document that is appropriate for judicial review are in dispute, the

14  court may take judicial notice of the existence of the document without taking judicial notice of the

15  truth of its contents or of one party's opinion of how that document should be interpreted. <u>Lee v.</u>

16  <u>City of Los Angeles</u>, 250 F.3d 668, 689-90 (9th Cir. 2001); <u>Troy Group, Inc. v. Tilson</u>, 364 F.

17  Supp. 2d 1149, 1152 (C.D. Cal. 2005); <u>S. Cal. Edison Co.</u>, 300 F. Supp. 2d at 974; <u>Competitive</u>

18  <u>Techs. v. Fujitsu Ltd.</u>, 286 F. Supp. 2d 1118, 1123 n. 4 (N.D. Cal. 2003).  The court will take

19  judicial notice of the existence of documents (1) through (11), but not the truth of the content of

20  those documents or Moving Defendants' interpretation of their contents.

21                                      **III.**

22                          **<u>EVIDENTIARY OBJECTIONS</u>**

23  **A.     Plaintiffs' Evidentiary Objections**

24          The following objections by Plaintiffs to the declaration of Nora Linville, dated April 8,

25  2005 and filed April 12, 2005, are overruled:  1-9.

26          The following objections by Plaintiffs to the declaration of Jane Stancliffe, dated April 8,

27  2005 and filed April 12, 2005, are overruled:  1-3, 4(a), 4(c)-(e), 5-8, 9(a), 9(b), 9(d), and 10.  The

28  following objections are sustained:  4(b), 9(c), and 9(e).

1    The following objections by Plaintiffs to the declaration of Julie Lindemuth, dated April 11,

2    2005 and filed April 13, 2005, are overruled:  1-3, 5-11, 12(a), 12(c), 13-18, 19(a), 19(d), 19(f),

3    20(c)-(f), 21-40, 41(c), 41(e), 42-44, 45(c), 45(e), 46-48, 49(a)-(c), 50(e), 51(a), 51(c)-(d), 52(a),

4    52(c)-(d), 53(a), 53(c)-(e), 54, 55(a), 55(c)-(e), 56(c)-(d), 57(a), 57(c)-(d), 58(a), 58(c)-(d), 59(a),

5    59(c)-(d), 60(c)-(d), 61(a), 61(c)-(e), 62(a), 62(c)-(e), 63(a), 63(c)-(e), 64-67, and 69(b).  The

6    following objections are sustained:  4, 12(b), 19(b), 19(c), 19(e), 20(a)-(b), 41(a), 41(b), 41(d),

7    45(a), 45(b), and 45(d), 49(d), 50(a), 50(c)-(d), 51(b), 51(e), 52(b), 53(b), 55(b), 56(a)-(b), 57(b),

8    57(e), 58(b), 59(b), 60(a)-(b), 61(b), 62(b), 63(b), 68(a)-(b), 69(a), and 69(c).

9    Plaintiffs' objections to the following proffered undisputed facts (not evidence) in

10   American's Statement of Uncontroverted Facts and Conclusions of Law are overruled:  Facts # 63,

11   64, 77, 99, 101, and 102.  Objections to Facts 67, 96, 98, and 100 are sustained.[2]

12   **B.    Moving Defendants' Evidentiary Objections**

13   The following objections by Moving Defendants to the declaration of Nancy Wolfe, dated

14   June 20, 2005 and filed June 30, 2005, are overruled:  1 (with respect to the first and second

15   sentences of paragraph three), 3 and 4.  The following objections are sustained:  1 (with respect to

16   the third and fourth sentences of paragraph three), and 2.

17   The following objections by Moving Defendants to the declaration of Antoinette Alexander,

18   dated June 10, 2005 and filed June 30, 2005, are sustained:  1-10.

19   The following objections by Moving Defendants to Plaintiffs' deposition and documentary

20   evidence are overruled:  1, 2 (except as noted below), 3-7, 9-13, 14, 16-20, 22-25, 26 (with respect

21   to the party admission by Barbara Amster, American's vice president for pricing and yield

22   management), 27, and 28 (with respect to paragraphs five and six of the Declaration of Nancy

23   Wolfe, dated June 20, 2005 and filed June 30, 2005).  The following objections are sustained:  2

24   (with respect to the Deposition of Charlotte Downing at 54:10-16), 8, 14-15, 21, 26 (with respect to

25

26   [2] Amazingly, despite the court's repeated instruction not to make evidentiary objections in its
Statement of Genuine Issues, compare William W. Schwarzer, et al., California Practice Guide:  Federal

27   Civil Procedure Before Trial § 14, Form 14:D (2004) (example of statement of genuine issues in opposition
to motion for summary judgment), with id. § 14, Form 14:F (example of evidentiary objections made in

28   connection with a motion for summary judgment), Plaintiffs still made ten evidentiary objections in its
third Statement of Genuine Issues.

1   the other statements), and 28 (with respect to paragraphs three and four of the Declaration of Nancy

2   Wolfe, dated June 20, 2005 and filed June 30, 2005).[3]

3        Moving Defendants' objection to the following proffered undisputed facts (not evidence) in

4   Plaintiffs' Statement of Genuine Issues is sustained:  Fact # 224.[4]

5                                                    **IV.**

6                          **UNCONTROVERTED MATERIAL FACTS**

7        The following facts are uncontroverted material facts supported by admissible evidence:

8        In 1984, American and other airlines created the Airline Reporting Corporation ("ARC") to

9   act as a central clearinghouse for travel agents to report, settle, and account for airline ticket sales

10  on behalf of the air carriers that the ARC represents and to establish a common accreditation

11  program for travel agents.

12       Westways and Sundance both signed the Agent Reporting Agreement with the ARC, which

13  states the terms and conditions under which they may issue tickets for American.  Through the

14  ARC Standard Ticket and Area Settlement Plan ("ARC Settlement Plan"), the ARC accredits travel

15  agents for many airlines, including American, and provides a central clearinghouse for the

16  settlement of airline ticket sales.  Participating travel agents make a single consolidated ticket sales

17  report and remit funds for their sales on all participating carriers directly to the ARC, and ARC

18  ensures that each carrier receives the funds from all reporting travel agencies.

19       Tens of thousands of different United States travel agencies and hundreds of different

20  domestic and international carriers, including American, participate in the ARC Settlement Plan.

21  To participate in the ARC Settlement Plan, a carrier must execute the ARC Carrier Services

22

23           [3] The following deposition pages were not included in Plaintiffs' evidence and, as a result, the
    court did not rule on Moving Defendants' objections to them:  pages 72 and 73 of the Deposition of
24  Charlotte Downing; pages 63 and 64 of the Deposition of Nancy Wolfe; and page 68 of the Deposition of
    Duane Wolfe.

25
            [4] Even more amazingly, Moving Defendants made evidentiary objections in their Reply to
26  Plaintiffs' Statement of Genuine Issues after having twice moved to strike Plaintiffs' prior attempts to make
    evidentiary objections to Moving Defendants' Statement of Genuine Issues in part on that ground.  Since
27  the court already ruled on American's objections to the Declaration of Nancy Wolfe above, it need not rule
    on American's objection to Facts # 213-222, which are based upon that declaration.  The court has also
28  ignored the editorial insertions that appear periodically in Moving Defendants' Reply to Plaintiff's
    Statement of Genuine Issues.

                                                       6

1   Agreement ("Carrier Services Agreement"), which American did.  Any United States travel agency

2   may participate in the ARC Settlement Plan by meeting the qualifications to become an ARC-

3   accredited agent and by executing a Memorandum of Agreement to the ARC Agent Reporting

4   Agreement ("Memorandum of Agreement").  By executing this Memorandum of Agreement, the

5   travel agent agrees to be bound by the terms and conditions of the Agent Reporting Agreement.  All

6   travel agents must also maintain a bond or letter of credit pursuant to the Agent Reporting

7   Agreement.

8         Westways and Sundance each executed a Memorandum of Agreement.  Westways received

9   its accreditation on March 12, 1979, and Sundance received its accreditation on January 24, 1984.

10   As part of the accreditation process, Westways and Sundance agreed to be bound by the terms of

11   the Agent Reporting Agreement.

12         The ARC's articles of incorporation allow ARC's stock to be held by as many as thirty

13   airlines, but none of the ARC's shareholders are permitted to own more than one share of the

14   ARC's stock and no shareholder is permitted to have more than one representative on the ARC's

15   Board of Directors.  American has one representative on the ARC's Board of Directors, and owns

16   one share of the ARC's outstanding stock.  Travel agents have no positions on the ARC's Board of

17   Directors.

18         Under the terms of the Agent Reporting Agreement, American permits appointed travel

19   agents to sell tickets for air transportation on American's travel network.  Without such permission,

20   travel agents have no right to sell tickets on behalf of American.  The Agent Reporting Agreement

21   provides that (1) it "establishes a principal-agent relationship" between American and each travel

22   agent, (2) "the Agent shall comply with all instructions of the carrier, and shall make no

23   representation not previously authorized by the carrier," (3) debit memos are defined as "any

24   written or electronically transmitted request from a carrier to an agent for payment of any

25   obligation arising under this agreement," (4) "[i]f an Agent fails to pay a debit memo sent to it by a

26   carrier . . ., the carrier may . . . [t]erminate its appointment of the Agent," and (5) "[a] carrier

27   appointment may be terminated as between the Agent and any individual carrier at any time by

28   notice in writing from one to the other."  The Agent Reporting Agreement does not contain a

1    liquidated damages clause.  At various times, the Agent Reporting Agreement has been distributed
2    by mail or made available on-line.

3         Through the ARC, travel agents submit payment for ticket sales.  Millions of transactions
4    between the ARC, the travel agents, and the subscribing air carriers occur annually.  When a carrier
5    terminates a travel agent, the ARC will notify all air carriers as well as various computerized
6    reservation systems, such as Sabre, of the termination.  When the ARC notifies all other air carriers
7    as well as Sabre and other computerized reservation systems of a travel agent termination, the
8    travel agent is unable to issue any tickets on the terminating carrier or through any other carrier.

9         The ARC Industry Agents' Handbook ("ARC Handbook") specifically requires that the
10   travel agent must "maintain a thorough knowledge of tariffs, routings, fares," and also states that
11   "[m]any carriers have specific rules and regulations regarding their conditions of carriage."  The
12   ARC Handbook, of which the ARC Agreement is a part, also explains various procedures for
13   ticketing, and refers to such procedures as "instructions."

14        The Carrier Services Agreement states that it "governs the terms and conditions under
15   which ARC will provide, and the Carrier will utilize, services relating to transactions involving the
16   sale or issuance of ARC traffic documents naming the Carrier as ticketing carrier, and/or including
17   scheduled passenger transportation of the Carrier, by accredited Agents."  In December 1984,
18   American executed the Carrier Services Agreement, which provides that "[i]nstructions or
19   directives the Carrier issues to its Agents and Corporate Travel Departments concerning the sale or
20   issuance and reporting and settlement of ARC traffic documents shall be in conformity with this
21   Agreement."  The Carrier Services Agreement provides that any carrier-proposed amendment to the
22   Agent Reporting Agreement must be first submitted to the President of the ARC for referral and
23   approval by the ARC Board of Directors or stockholders, which directors or stockholders "shall be
24   the only bodies authorized to amend" the Agent Reporting Agreement.

25        In American's Addendum to the ARC Reporting Agreement ("Addendum"), the first
26   paragraph informs travel agents that their "continued sale of air transportation on American shall
27   evidence our mutual agreement that the ARC Reporting Agreement, as applicable between Agent,
28   American, and ARC, shall be amended as set forth below, and as such, shall constitute additional

1   terms and conditions of Agent's appointment." American never obtained approval from the ARC

2   for the Addendum, which it states is an amendment to the Agent Reporting Agreement.

3       The Addendum states that (1) "Agent acknowledges that hidden city ticketing, beyond point

4   ticketing, cross-border ticketing and speculative or abusive bookings are in violation of

5   American[']s Conditions of Carriage and tariffs and other rules and regulations, and if Agent sells

6   or books such tickets, Agent will be in violation of these rules, regulations and tariffs," (2) "[i]t is

7   the responsibility of Agent to know its customers and to ensure that ticketing or bookings done by

8   Agent are not for hidden city ticketing, beyond point ticketing, or cross-border ticketing or for

9   speculative or abusive purposes," (3) the Agent must "strictly adhere to American's instructions,

10  rules, regulations, requirements, conditions of sale, and tariffs, [sic] in the issuance, reissuance, or

11  refund of any ticket calling for transportation on American," and (4) "[a]udits by American that

12  show that Agent has engaged in these practices subjects Agent to debit memos to recover the

13  difference between the applicable fare and the fare actually used and/or the termination of Agent's

14  appointment."

15      In 1993, American prohibited hidden-city ticketing, back-to-back ticketing, and throwaway

16  ticketing in its Domestic General Rules Tariff ("Tariff"). American's Tariff permits recovery for

17  ticketing violations against passengers.

18      American's Conditions of Carriage "serves as the contract for transportation between

19  American Airlines/American Eagle and each customer traveling wholly within/between the 50

20  United States, its territories and possessions." The Conditions of Carriage permits recovery of

21  ticketing violations against passengers.

22      Sabre's Computer Reservation System ("CRS") and other CRSs (e.g., Galileo, Worldspan,

23  Amadeus) contain information and notices posted by American. Sabre's computerized reservation

24  system is a real time system. Thousands of travel agents, including Plaintiffs, have contractual

25  relationships with Sabre to access airline schedules, fares, and issue airline tickets. Sabre also

26  transmits data to the ARC, including data regarding travel agent sales.

27      There is a daily news reference in the Direct Reference System ("DRS") in each CRS

28  (Amadeus, Apollo, Galileo, Sabre, and Worldspan) where American posts current news items.

1  Reminders of American's policies are frequently posted in the daily news for travel agents to read.

2  Both Westways and Sundance have access to and are familiar with the DRS and CRS.

3      American is a certified air carrier, and is principally engaged in the business of providing air

4  transportation to customers traveling between a multitude of points of origin and destinations

5  throughout the world.[5]  A passenger ticket is a contract between American and the passenger that

6  contains the general terms and conditions pursuant to which American agrees to provide air

7  transportation to the traveler.  The fare American charges for any given flight depends upon a

8  number of circumstances, such as the traveler's itinerary, the class of service purchased by the

9  traveler, the date of purchase, the date of travel, and the traveler's length of stay.  Fares are

10  established with different rules and restrictions.  Once a fare is established, a tariff reflecting that

11  fare and the associated rules and restrictions is generally filed by American with the Airline Tariff

12  Publishing Company ("ATPC").  While all tickets sold by American are subject to certain rules and

13  regulations, unrestricted full fare tickets are generally the least restrictive tickets available.

14      American may offer many different fares on the same flight, and each fare may be subject to

15  different terms and conditions.  Excursion fares are typically purchased by travelers who are able to

16  plan travel well in advance of their travel date, meet the minimum or Saturday-night stay

17  requirements and who need less flexibility to change travel plans on short notice.  American offers

18  a variety of terms and conditions for travel on its network, ranging from unrestricted, fully

19  refundable tickets, to deeply discounted tickets that are nonrefundable and subject to significant

20  rules and restrictions.

21      Debit memos are issued by the airlines without any oversight by the ARC.  The debit

22  memos are calculated based on the actual itinerary flown by the passenger.  For example, with

23  respect to back-to-back ticketing, if the passenger only traveled on one trip, the agent would be

24  billed the difference between the fare as traveled and the fare calculated for that one trip.  It is only

25  when a ticket is used by a passenger that any purported tariff violation occurs.  Not all debit memos

26

27

28
　　　　[5] American and American Eagle are 100% owned by AMR.  American Eagle Airlines, Inc. is a subsidiary of AMR American Eagle Holding Company.  The relationship between American Eagle Airlines and the travel agents is also governed by the Agent Reporting Agreement.

1    are issued for ticketing violations.  For instance, if the debit memo is for an improper or excessive

2    commission taken by a travel agent, the amount of the debit memo is the proper commission minus

3    the commission taken by the agent.

4            American represents in its debit memos and in other communications that its Tariff,

5    Conditions of Carriage, and Addendum provide the authority for issuing debit memos to travel

6    agents.  American mails the debit memos to travel agents and sometimes follows up with telephone

7    communications.  American uses the ARC to terminate travel agents who do not pay debit memos.

8    American had the ARC pull the plates of at least eight travel agents.  American knows that actually

9    pulling a travel agent's plates is the "ultimate penalty."  When the ARC notifies all other air

10   carriers as well as Sabre and other computerized reservation systems of a travel agent's

11   termination, the travel agent is unable to issue any tickets on the terminating carrier or through any

12   other carrier.

13           In April and May of 1995, Sundance received two separate debit memos from American in

14   which it demanded payment of $79,927.00 for Sundance's issuance of hidden city tickets in

15   violation of American's tariff prohibiting such.  When Sundance refused to pay, American sent a

16   letter to Sundance stating that its ability to issue tickets for American would be terminated if the

17   debit memos were not paid.  On July 12, 1995, Sundance wrote to American and stated that, after

18   reviewing the debit memos with its counsel, it had decided that settlement was in its and

19   American's best interests.  Sundance agreed to pay the debit memo under an installment plan.

20   Sundance paid the debit memos believing that it did not owe the amounts claimed by American.

21   American accepted the payments.

22           Robert Crandall ("Crandall") was the Chairman of AMR and President and Chief Executive

23   Officer ("CEO") of American until 1998.  Crandall was very active in the management of

24   American.  When Crandall departed in 1998, he was succeeded in these positions by Donald Carty

25   ("Carty"), who remained until 2002.  Craig Kreeger ("Kreeger") worked for American since 1985,

26   and was American's Vice President of Pricing and Yield Management from September 1995 to

27   September 1998.  From 1998 to January 2004, he was Vice President of Passenger Sales.  Peter

28   Bowler ("Bowler") was American's Vice President for Sales, and later President of AMR Eagle

                                              11

1    Holding in 2004.

2         From the mid-1980s until approximately 1999, Michael Gunn ("Gunn") was American's

3    Senior Vice President of Marketing.  In 1999, he was promoted to Executive Vice President of

4    Marketing and Planning Department.  He reported directly to the President and CEO of American

5    from 1986 until 2002.  Gunn was responsible for American's relationships with travel agencies and

6    Gunn was responsible for making decisions to reduce travel agency commissions.  In the mid-

7    1990s, American reduced the commission it paid to travel agents several times.  Also during that

8    time, American's Finance Department began to create annual reports tracking the cost to American

9    of back-to-back ticketing.

10        On May 23, 1997, Gunn sent a memo to Bowler stating that due to the growing differential

11   between full and discounted fares, it was likely that more customers are attempting to use back-to-

12   back fares or such other practices.  Gunn asked Bowler to coordinate with Tom Horton ("Horton")

13   in the Finance Department to see whether American's fraud protections systems were "up to snuff,"

14   if American is noting any increase in such attempts, and whether offenders were being sufficiently

15   punished.  Gunn copied his memo to Crandall and Carty.  Gunn directed Bowler and Morton to

16   report back in thirty days.  Bowler reported to Gunn that the Finance Department had stepped up its

17   auditing efforts in "DFW" and had issued "an unprecedented number of debit memos."

18        In May 1997, Crandall sent Gunn and Carty a copy of a May 27, 1997 article from the

19   Dallas Morning News discussing a website magazine entitled "Best Fares" with a handwritten note

20   inquiring "do we read this – and do all possible to block illegal usage?"  Kreeger was assigned the

21   task of responding to Crandall's inquiry.  On June 24, 1997, Kreeger wrote to Crandall, Carty,

22   Gunn, Bowler, and Horton, among others, stating that American monitored any endorsement of the

23   ticketing practices, investigated offending travel agencies, took action where appropriate, issued

24   cease and desist letters when appropriate, issued debit memos when necessary, and pulled the

25   plates of repeat offenders.  Crandall responded the next day by saying "Craig, Good!"  Crandall

26   never objected to the manner in which Kreeger was handling hidden city and back-to-back

27   ticketing.

28        On June 23, 1997, Christopher Dane ("Dane"), the Managing Director of American's

12

Agency Sales Department, gave Gunn a written report on hidden city and back-to-back ticketing. On July 23, 1997, Dane sent a letter to all the travel agent representatives who participated in a July 8, 1997 Dallas focus group meeting on hidden-city and back-to-back ticketing. Attached to this letter was a "Forward Plan" outlining the actions that American intended to take regarding hidden city and back-to-back ticketing.

On July 31, 1997, Bowler reported to Gunn on Gunn's and Crandall's notes requesting information on the extent of hidden-city and back-to-back ticketing abuse. Bowler stated that he hoped this would help Gunn in his briefing of Crandall. There was an internal debate within American in 1997 with respect to the scope of audits to be conducted and the debit memos to be issued to travel agents for hidden-city, back-to-back, and throwaway ticketing.

American mailed three separate debit memos to Westways on October 16, 1997, June 8, 1998, and July 2, 1998. The total amount demanded in these debit memos was $33,749.10 for tickets issued in violation of the Tariff and the Addendum. Westways vigorously contested its obligation to pay and even retained counsel to fight the debit memos. When Westways refused to pay the debit memos, American sent a letter to Westways stating that (1) it was obligated to pay or resolve the debit memos within thirty days, (2) failure to do so would place Westways in default of its obligation to American, which could result in the termination of Westways' authority to sell tickets on American, and (3) American felt assured that Westways would act immediately to preserve its ability to sell tickets on American. Westways paid the debit memos believing that it did not owe the amounts claimed by American.

## V.

## ANALYSIS

### A.   Legal Standard for Summary Judgment Motions

Under Rule 56(c), a district court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The Supreme Court and the Ninth Circuit have established the following standards for

13

1  consideration of such motions: "[i]f the party moving for summary judgment meets its initial

2  burden of identifying for the court the portions of the materials on file that it believes demonstrate

3  the absence of any genuine issue of material fact," the burden of production then shifts so that "the

4  nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, '*specific facts*

5  showing that there is a genuine issue for trial.'" T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors

6  Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (quoting Fed. R. Civ. P. 56(e), and citing Celotex Corp. v.

7  Catrett, 477 U.S. 317, 323 (1986), and Kaiser Cement Corp. v. Fischbach & Moore, Inc., 793 F.2d

8  1100, 1103-04 (9th Cir. 1986)).  With respect to the specific facts offered by the nonmoving party,

9  the court does not make credibility determinations or weigh conflicting evidence, and is required to

10  draw all inferences in the light most favorable to the nonmoving party. See id. at 630-31 (citing

11  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

12  Rule 56(c) requires entry of summary judgment "after adequate time for discovery and upon

13  motion, against a party who fails to make a showing sufficient to establish the existence of an

14  element essential to that party's case, and on which that party will bear the burden of proof at trial."

15  Celotex, 477 U.S. at 322.  In order to defeat a motion for summary judgment, the plaintiff must

16  present significant probative evidence tending to support the complaint. See Rand v. Rowland, 154

17  F.3d 952, 963 (9th Cir. 1998); T.W. Elec. Serv., 809 F.2d at 630.  The mere existence of a scintilla

18  of evidence in support of the nonmoving party's position is insufficient: "there must be evidence

19  on which the jury could reasonably find for the [nonmoving party]." Anderson v. Liberty Lobby,

20  Inc., 477 U.S. 242, 252 (1986).  This court thus applies to either party's motion for summary

21  judgment the same standard as for a motion for directed verdict: "whether the evidence presents a

22  sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

23  must prevail as a matter of law." Id.

24  **B.  Moving Defendants' Motion for Summary Judgment**

25  **1.  Claim One – Violation of Section 1962(c)**

26  The elements of a civil RICO claim under Section 1962(c) are "(1) conduct (2) of an

27  enterprise (3) through a pattern (4) of racketeering activity. Miller v. Yokohama Tire Corp., 358

28  F.3d 616, 620 (9th Cir. 2004).  Racketeering activity is "any act indictable under several provisions

14

1  of Title 18 of the United States Code," including extortion, mail fraud, and wire fraud. See 18

2  U.S.C. § 1961(1); Turner v. Cook, 362 F.2d 1219, 1229 (9th Cir. 2004). "In order to constitute a

3  'pattern,' there must be at least two acts of racketeering activity within ten years of one another."

4  Turner, 362 F.2d at 1229. "A 'pattern' of racketeering activity also requires proof that the

5  racketeering predicates are related and 'that they amount to or pose a threat of continued criminal

6  activity.'" Id. (quoting H.J. Inc. v. N.W. Bell Tel. Co., 492 U.S. 229, 239 (1989)).

### a.    RICO Statute of Limitations

8         Moving Defendants contend that they are entitled to summary judgment on claim one for

9  violation of Section 1962(c) as to Sundance because, as a matter of law, Sundance did not bring its

10  RICO claim within the statute of limitations.

11        The statute of limitations for a civil RICO claim is four years. Grimmett v. Brown, 75 F.3d

12  506, 510 (9th Cir. 1996). Under the "injury discovery" rule, "the civil RICO limitations period

13  'beings to run when a plaintiff knows or should know of the injury that underlies his cause of

14  action.'" Id. (quoting Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp., 828 F.2d 211, 220

15  (4th Cir. 1987)). "The plaintiff need not discover that the injury is part of a 'pattern of

16  racketeering' for the period to begin to run." Id. The "injury discovery" rule incorporates the

17  "separate accrual" rule, which "provides that a new cause of action accrues for each new and

18  independent injury, even if the RICO violation causing the injury happened more than four years

19  before." Id. The statute of limitations for civil RICO claims can be subject to equitable tolling. Id.

20  at 514.

21        The question is whether Sundance knew or should have known of the injury underlying its

22  RICO cause of action before July 26, 1995, which was four years prior to the filing of the

23  complaint. Id. at 510. The predicate acts of Plaintiffs' RICO claim are extortion and mail and wire

24  fraud. The Hobbs Act, which prohibits the obstruction of interstate commerce by extortion, defines

25  extortion as "*the obtaining of property from another*, with his consent, induced by wrongful use of

26  actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2) (emphasis added). As a

27  consequence, the injury from extortion would not occur until the defendant obtained the property

28  from the plaintiff. Mail and wire fraud, which prohibit the use of mails or wires to engage in a

1  scheme to defraud with intent to defraud, require proof of individualized reliance on the

2  defendant's misconduct, e.g., misrepresentation of material facts. See Miller, 358 F.3d at 620;

3  Poulos v. Caesars World, Inc., 379 F.3d 654, 664-66 (9th Cir. 2004); United States v. Manion, 339

4  F.3d 1153, 1156 (9th Cir. 2003). The injury from mail and wire fraud would not occur until the

5  plaintiff relied on the defendant's misconduct.

6      It is uncontroverted that American sent two debit memos to Sundance on March 27, 1995

7  and May 4, 1995 to recoup money from the ticketing practices. On June 28, 1995, American

8  informed Sundance that its "agency will be reviewed for termination of its American Airlines

9  appointment" if Sundance did not pay the debit memos. In a July 12, 1995 letter, Sundance agreed

10  to pay the debit memos. Sundance presented evidence that it paid the debit memos in an

11  installment plan from August to December 1995.

12      Based on this evidence, American did not obtain any property from Sundance until August

13  1995, and no injury based on extortion could have occurred until that date. Similarly, in light of

14  this evidence, Sundance did not rely on American's issuance of the debit memos until it paid them

15  beginning in August 1995, and no fraudulent injury could have occurred until that date. The

16  August 1995 payments fall within the four year statute of limitations for Plaintiffs' civil RICO

17  claim. Sundance has presented sufficient evidence to establish a genuine issue of material fact as

18  to whether it knew or should have known of the injury underlying its civil RICO claim within the

19  statute of limitations.

20      The court will deny Moving Defendants' motion for summary judgment as to Sundance

21  regarding claim one based on statute of limitations.

22      **b.    Lack of Probative Evidence of RICO Predicate Acts – Extortion**

23      American contends that it is entitled to summary judgment on Plaintiffs' claim for violation

24  of Section 1962(c) because, as a matter of law, Plaintiffs cannot establish the predicate offense of

25  extortion. Specifically, American asserts that it is entitled to summary judgment because, as a

26  matter of law, American had a contractual right under the Agent Reporting Agreement to issue

27  debit memos to travel agents for the recoupment of American's losses from the ticketing practices,

28  and it is not extortion to obtain money to which American had a contractual right. Plaintiffs

16

1   counter that American had no contractual right under the Agent Reporting Agreement to issue these

2   debit memos.

3        **1.    Claim of Right**

4        A defendant cannot be guilty of extorting property in violation of the Hobbs Act unless he

5   or she "has no lawful claim to that property." United States v. Enmons, 410 U.S. 396, 399-400

6   (1973); see also United States v. Dischner, 974 F.2d 1502, 1516 (9th Cir. 1992), overruled on other

7   grounds by United States v. Morales, 108 F.3d 1031, 1035 n.1 (9th Cir. 1997) (en banc).  When a

8   defendant has a contractual right to obtain property, the defendant cannot commit extortion by

9   obtaining such property.  See, e.g., Zaro Licensing, Inc. v. Cinmar, Inc., 779 F. Supp. 276, 283

10  (S.D.N.Y. 1991); Am. Computer Trust Leasing v. Jack Farrell Implement Co., 763 F. Supp. 1473,

11  1492-93 (D. Minn. 1991).

12       **2.    Choice of Law**

13       An initial question is what law should be applied in determining American's contractual

14  right pursuant to the Agent Reporting Agreement to issue debit memos to travel agents for the

15  ticketing practices.  The Agent Reporting Agreement contains a choice-of-law provision stating

16  that "[t]his Agreement shall be construed in accordance with, and governed by, the laws of the

17  Commonwealth of Virginia."

18       Under California choice-of-law principles, the court must apply the law designated in a

19  contractual provision unless (1) the chosen state has no substantial relationship to the parties or the

20  transaction, or there is no reasonable basis for the parties' choice of law, or (2) application of the

21  choice-of-law clause would be contrary to a California statute or public policy. Gen. Signal Corp.

22  v. MCI Telecom. Corp., 66 F.3d 1500, 1506 (9th Cir. 1995); Nedlloyd Lines B.V. v. Sup. Ct., 11

23  Cal. Rtpr. 2d 330, 333-34 (Cal. 1992).

24       Since none of the parties are incorporated or have their principal place of business in

25  Virginia, Virginia does not have a substantial relationship with the parties or the transaction.[6] Id.

26  Nevertheless, since the Agent Reporting Agreement applies to numerous airlines and travel agents

27

28          [6] The ARC, which was a defendant in this action until it reached a settlement with Plaintiffs, had
its principal place of business in Virginia.

17

based in states throughout the country, uniformity in the interpretation of the Agent Reporting Agreement is a reasonable basis for enforcing the choice-of-law clause.  See, e.g., In re Vinogradova, 270 B.R. 159, 181 (Bankr. S.D.N.Y. 2001) (noting that Virginia law was the law governing the Agent Reporting Agreement).  Neither party has argued or presented evidence that the application of Virginia law would be contrary to a California statute or public policy.

The court concludes that it must apply Virginia law to interpret the Agent Reporting Agreement pursuant to its choice-of-law clause.

### 3.  American's Contractual Right to Issue Debit Memos

"The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares."  Wilson v. L.B. Holyfield, 313 S.E.2d 396, 398 (Va. 1984) (quoting Meade v. Wallen, 311 S.E.2d 103, 104 (Va. 1984)).  When the terms of a contract are clear and unambiguous, the interpretation of those terms is a question of law for the court.  Gordonsville Energy, L.P. v. Va. Elec. & Power Co., 512 S.E.2d 811, 816 (Va. 1999); Westmoreland-LG & E Partners v. Va. Elec. & Power Co., 486 S.E.2d 289, 294 (Va. 1997). Summary judgment is improper, however, when the terms of a contract are ambiguous. Westmoreland-LG & E Partners, 486 S.E.2d at 294.  "An ambiguity exists when language admits of being understood in more than one way."  Id. (internal citations and quotations omitted). "Contracts are not rendered ambiguous merely because the parties or their attorneys disagree upon the meaning of the language employed to express the agreement."  Id. (quoting Doswell Ltd. P'ship v. Va. Elect. & Power Co., 468 S.E.2d 84, 88-89 (Va. 1996)).

American contends that, as a matter of law, the Agent Reporting Agreement allows for the issuance of debit memos to recoup money from travel agents for the  ticketing practices because there is no genuine issue of material fact as to whether (1) the Agent Reporting Agreement provides for the issuance of debit memos to travel agencies for the payment of "any obligation" arising under that agreement, including the obligation of travel agents to comply with a carrier's instructions, and (2) American issued instructions prohibiting back-to-back ticketing, hidden city ticketing, and throwaway ticketing.  The court will address each part of this contention in turn.

1        *(i)*      *Whether a Carrier Has the Right, as a Matter of Law, to Issue Debit Memos for*

2                            *Payment Resulting from a Travel Agent's Failure to Comply with a Carrier's*

3                            *Instructions*

4        The court will examine whether there is a genuine issue of material fact as to whether the

5  Agent Reporting Agreement provides for the issuance of debit memos for the payment of "any

6  obligation" arising under that agreement, including the obligation of travel agents to comply with a

7  carrier's instructions.

8        It is uncontroverted that the Agent Reporting Agreement is the umbrella contract governing

9  the relationship between airlines and travel agents, and that American and Plaintiffs are parties to

10  it.  In Section II of the Agent Reporting Agreement ("Section II"), "debit memo" is defined as "any

11  written or electronically transmitted request from a carrier to an agent for payment of any

12  obligation arising under this agreement."  Section XIX of the Agent Reporting Agreement affirms

13  that carriers have the right to issue debit memos, and Section VIII.E of the Agent Reporting

14  Agreement ("Section VIII.E") states that "[i]f the Agent fails to pay a debit memo sent to it by a

15  carrier," the carrier may terminate the agent's appointment or withdraw the carrier's identification

16  plates from the agent.  Based on the foregoing provisions, the court concludes that the Agent

17  Reporting Agreement clearly and unambiguously allows carriers to issue debit memos "for

18  payment of any obligation arising under this agreement," and to terminate an agent's appointment

19  for failure to pay a debit memo.

20        American contends that its authority to issue debit memos to travel agents to recoup

21  payments from the ticketing practices stems from Section VII.H of the Agent Reporting Agreement

22  ("Section VII.H"), which provides that "[t]he Agent shall comply with all instructions of the

23  carrier."  The question is whether, as a matter of law, a travel agent's compliance with the carrier's

24  instructions constitutes an obligation arising under the Agent Reporting Agreement.  See Agent

25  Reporting Agreement, Section II (defining debit memo).  An "obligation" is "[a] social, moral, or

26  legal requirement, as a contract or promise, compelling one to a given course of action."  Webster's

27  II New Riverside University Dictionary 810 (1994).  Section VII.H, which uses mandatory

28  language–"shall comply"–to compel a travel agent's compliance with a carrier's instructions, is

1    plainly a "legal requirement" under the Agent Reporting Agreement.  In fact, Section VII is titled

2    "Agent's Authority, General Rights and Obligations," and the mandate in Section VII.H certainly

3    falls into the category of an "Agent's Obligations" rather than an "Agent's Authority" or an

4    "Agent's General Rights."

5         Moreover, by preceding "obligation" with "any" in the definition of debit memo, the parties

6    to the Agent Reporting Agreement indicated their intent to include each obligation arising under

7    the Agent Reporting Agreement within the reach of debit memos, including a travel agent's

8    obligation to follow a carrier's instructions.  See Webster's II New Riverside University Dictionary

9    115 (1994) (defining "any" as "one or another without exception or restriction" and "[t]he whole

10   amount of"); see also Westmoreland-LG & E Partners, 486 S.E.2d at 294 ("'No word or clause in

11   the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a

12   presumption that the parties have not used words needlessly.'") (quoting D.C. McClain, Inc. v.

13   Arlington County, 452 S.E.2d 659, 662 (Va. 1995)).  In light of the plain language of the Agent

14   Reporting Agreement, the court concludes that the mandate of Section VII.H clearly and

15   unambiguously includes an obligation arising under the Agent Reporting Agreement.

16        The court further concludes that the Agent Reporting Agreement clearly and unambiguously

17   provides for the issuance of debit memos to recoup payments resulting from a travel agent's failure

18   to comply with a carrier's instructions, and allows carriers to terminate agent appointments for

19   failure to pay such debit memos.

20        **(ii)      *Whether, as a Matter of Law, American Issued Instructions Pursuant to the***

21                *Agent Reporting Agreement Prohibiting Back-to-Back Ticketing, Hidden City*

22                *Ticketing, and Throwaway Ticketing*

23        The question then becomes:  is there a genuine issue of material fact as to whether

24   American issued instructions to travel agents, including Westways and Sundance, pursuant to the

25   Agent Reporting Agreement that prohibited back-to-back ticketing, throwaway ticketing, and

26   hidden city ticketing?  American contends that it issued instructions pursuant to the Agent

27   Reporting Agreement prohibiting these ticketing practices in (1) the Addendum, (2) American's

28   Conditions of Carriage, (3) American's Tariff, (4) the July 15, 997 CRS posting, and (5) various

20

1    other agreements between American and travel agents.

2        *(a)    The Addendum*

3        In the Addendum, American requires that travel agents "strictly adhere to American's rules,

4    regulations, requirements, conditions of sale, and tariffs, [sic] in the issuance, reissuance or refund

5    of any ticket calling for transportation on American." The Addendum also provides that "Agent

6    acknowledges that hidden city ticketing, beyond point ticketing, cross-border ticketing and

7    speculative or abusive bookings are in violation of American's Conditions of Carriage and Tarrifs

8    and other rules or regulations, and that if Agent sells or books such tickets, Agent will be in

9    violation of these rules, regulations, and tariffs." The Addendum further provides that "[i]t is the

10   responsibility of Agent to know its customers and to ensure that ticketing or bookings done by

11   Agent are not for hidden city ticketing, beyond point ticketing, cross-border ticketing, or for

12   speculative and abusive purposes."

13       Plaintiffs note that the first paragraph of the Addendum claims that "the ARC Reporting

14   Agreement, as applicable between Agent, American and ARC, shall be amended as set forth below,

15   and as such, shall constitute additional terms and conditions of Agent's appointment." This

16   paragraph of the Addendum also states that a travel agent's continued sale of American tickets

17   constitutes acceptance of the Addendum's terms. Yet, as Plaintiffs point out, the Carrier Services

18   Agreement, which was executed by American, establishes a specific procedure for carrier-proposed

19   amendments to the Agent Reporting Agreement. If a carrier wants to amend the Agent Reporting

20   Agreement, it must "submit a proposal to the President of ARC for referral to the ARC Board of

21   Directors or stockholders," who are "the only bodies authorized to amend" the Agent Reporting

22   Agreement. It is uncontroverted that American did not follow this procedure in issuing the

23   Addendum.

24       The plain meaning of "instructions" is "an authoritative direction" or "order." Webster's II

25   New Riverside University Dictionary 633 (1994). While the Addendum's prohibitions on the

26   ticketing practices might be a direction, American's purported amendment to the Agent Reporting

27   Agreement did not go through the proper procedures and, as a consequence, may not be

28   authoritative, defined as "[h]aving or arising from proper authority." Webster's II New Riverside

21

1   University Dictionary 139 (1994); <u>see also</u> Carrier Services Agreement, Section VI.C (requiring

2   "[i]nstructions or directives the Carrier issues to its Agents" to "be in conformity with this

3   Agreement"). The court concludes that there are underlying genuine issues of material fact as to

4   whether the Addendum can be considered one of American's instructions issued pursuant to the

5   Agent Reporting Agreement.

6       *(b)*     *Conditions of Carriage*

7       American's Conditions of Carriage "serves as the contract for transportation between

8   American Airlines/American Eagle and each customer traveling wholly within/between the 50

9   United States, its territories and possessions." The Conditions of Carriage provides that

10       AMERICAN SPECIFICALLY PROHIBITS THE PRACTICES COMMONLY KNOWN AS –

11       *BACK-TO-BACK TICKETING* THE COMBINATION OF TWO OR MORE ROUNDTRIP

12       EXCURSION FARES END TO END FOR THE PURPOSE OF CIRCUMVENTING MINIMUM

13       STAY REQUIREMENTS,

14       * THROWAWAY TICKETING* THE USAGE OF ROUNDTRIP EXCURSION FARE FOR

15       ONEWAY TRAVEL, AND

16       *HIDDEN CITY/BEYOND POINT TICKETING* PURCHASE OF A FARE FROM A POINT

17       BEFORE THE PASSENGER'S ACTUAL ORIGIN OR TO A POINT BEYOND THE

18       PASSENGER'S ACTUAL DESTINATION.

19   American added this prohibition to the Conditions of Carriage in 1993. The Conditions of Carriage

20   permits recovery of ticketing violations against passengers.

21       The plain language of the Conditions of Carriage clearly directs that these three ticketing

22   procedures are specifically prohibited by American. Plaintiffs have presented no evidence that the

23   Conditions of Carriage are not authoritative.

24       Plaintiffs do contend that "instructions" is limited to instructions given directly from the

25   carrier to the travel agent, and instructions like the Conditions of Carriage given by the carrier to

26   passengers do not bind travel agents. The court disagrees with Plaintiffs' interpretation for two

27   reasons. Unlike Section VII.G of the ARC Agreement ("Section VII.G"), which states "[t]he Agent

28   shall comply with all instructions consistent with this agreement properly issued *to him* by ARC in

1   the [ARC Handbook] and other specific instructions consistent with this agreement" (emphasis

2   added), Section VII.H of the ARC Agreement states that "[t]he Agent shall comply with all

3   instructions of the carrier."  The conspicuous inclusion of "to him" in Section VII.G and the

4   exclusion of "to him" in Section VII.H, the very next section of the Agent Reporting Agreement,

5   evidences that the parties to the Agent Reporting Agreement intended that travel agents would

6   follow a carrier's instructions whether or not those instructions were specifically issued to them.

7   See Webster's II New Riverside University Dictionary 93 (1994) (defining "all" as "[t]he total

8   entity or extent of"); see also Westmoreland-LG & E Partners, 486 S.E.2d at 294 ("'A contract

9   must be construed as a whole to determine the parties intent with respect to specific provisions.'")

10   (quoting Hooper v. Musolino, 364 S.E.2d 207, 212 (1988)); Wilson, 313 S.E.2d at 187 ("[C]ourts

11   cannot read into contracts language which will add to or take away from the meaning of the words

12   already contained therein.").

13       In addition, Section VII.H does not just require travel agents to comply with the

14   "instructions" of the carriers, but rather requires travel agents to comply with "all instructions" of

15   the carrier.  By modifying "instructions" with "all", the parties to the Agent Reporting Agreement

16   further demonstrated their intent that travel agents must adhere to every instruction given by a

17   carrier, regardless of whether the instruction was specifically issued to them.  See Westmoreland-

18   LG & E Partners, 486 S.E.2d at 294 ("'No word or clause in the contract will be treated as

19   meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties

20   have not used words needlessly.'") (quoting D.C. McClain, Inc., 452 S.E.2d at 662).  Due to the

21   exclusion of "to him" and the modification of "instructions" by "all" in Section VII.H, the court

22   concludes that the plain language of Section VII.H obligates travel agents to comply with "all

23   instructions" of the carrier, whether they are issued to them or to passengers.

24       Plaintiffs also assert in their opposition that "instructions" as used in Section VII.H is

25   limited only to the bare procedures for issuing tickets as detailed in the ARC Handbook, such as

26   "the manner in which sales are recorded, the information placed on the ticket and the reporting

27   travel agents are required to make to ARC."  The logical result of adopting such a construction

28   would appear to be that more substantive instructions, like prohibiting certain ticketing practices,

23

1    would not fall within the scope of Section VII.H. Yet, Section VII.H contains no language that

2    would limit "instructions" to the procedural rather than the substantive aspects of ticketing policies

3    and practices. In fact, as discussed above, the language of Section VII.H is extremely broad and the

4    court is reluctant to read any artificial limitations into that language. See Wilson, 313 S.E.2d at

5    187 ("[C]ourts cannot read into contracts language which will add to or take away from the

6    meaning of the words already contained therein."). The court rejects Plaintiffs' attempt to limit the

7    language of Section VII.H.

8         Since the court has concluded that the Agent Reporting Agreement clearly and

9    unambiguously requires travel agents to comply with "all instructions" of the carrier, regardless of

10   whether they are issued to the carrier or the passenger, there is no genuine issue of material fact as

11   to whether the Conditions of Carriage constitute instructions prohibiting the issuance of back-to-

12   back ticketing, hidden city ticketing, and throwaway ticketing.

13       *(c)*    *American's Tariff*

14       Under Rule 100AA of American's Tariff,

15       [American] specifically prohibits the practices commonly known as:

16       "BACK-TO-BACK TICKETING" – The combination of two or more round-trip excursion fares

17       end to end for the purpose of circumventing minimum stay requirements; "THROWAWAY

18       TICKETING"– The usage of round-trip excursion fares for oneway travel; and "HIDDEN

19       CITY/BEYOND POINT TICKETING" – The purchase of a fare from a point before the

20       passenger's actual origin or to a point beyond the passenger's actual destination.

21   American added this prohibition to the Tariff in 1993. American's Tariff permits recovery of

22   ticketing violations against passengers.

23        The plain language of the Tariff clearly directs that these three ticketing procedures are

24   specifically prohibited by American. Plaintiffs have presented no evidence that the Tariff is not

25   authoritative. Plaintiffs again contend that the Tariff only constitutes instructions to the passenger

26   rather than the travel agent, but, as discussed above, the Agent Reporting Agreement requires travel

27   agents to follow "all instructions" of the carrier, regardless of whether they are to the agent or the

28   passenger. The court concludes that there is no genuine issue of material fact as to whether the

24

1    Tariff constitutes instructions prohibiting the issuance of back-to-back ticketing, hidden city

2    ticketing, and throwaway ticketing, with which travel agents, including Plaintiffs, must comply.

3           *(d)    July 15, 1997 CRS Posting*

4        American's July 15, 1997 CRS posting with Sabre provides detailed descriptions and

5    examples of back-to-back ticketing and hidden city ticketing, which are  characterized as "ticketing

6    abuses" and "fraudulent activities."  This posting also states that (1) American will "hold agencies

7    responsible and issue debit memos" for these ticketing practices, and (2) passengers who attempt to

8    use these ticketing practices may be denied boarding, have their tickets confiscated, or be required

9    to pay "the difference in the fare paid and lowest applicable fare for the actual itinerary."  It is

10    uncontroverted that both Westways and Sundance have access to and are familiar with the CRS.

11        The July 15, 1997 posting clearly directs that back-to-back ticketing and hidden city

12    ticketing are prohibited by American.  Plaintiffs have presented no evidence that the July 15, 1997

13    posting is not authoritative, nor do they provide evidence that they were unaware of or unable to

14    access this posting.  The court does note, however, that the July 15, 1997 posting does not mention

15    throwaway ticketing, and that the posting was issued two years after American issued debit memos

16    to Sundance.  The court concludes that there is no genuine issue of material fact as to whether the

17    July 15, 1997 posting constitutes "instructions" prohibiting the issuance of back-to-back ticketing

18    and hidden city ticketing after July 15, 1997.

19            *(e)    Other Agreements Between American and Travel Agents*

20        According to American, the following agreements executed by it and travel agents

21    constitute "instructions" prohibiting back-to-back ticketing, hidden city ticketing, and throwaway

22    ticketing:  Corporate Contracts, Up Front Commission Contracts, Bulk Fare and Marketing

23    Agreements, Incentive Contracts, Group and Travel Meeting Contracts, and Settlement

24    Agreements.  Other than an Incentive Contract between American and Sundance, American did not

25    submit as evidence any of these documents executed between it and Plaintiffs.  Although the

26    Incentive Contract between American and Sundance provides that Sundance "agrees to promptly

27    reconcile all SABRE/ADS billings and debit memos received from American" and that American

28    can terminate the agreement upon discovering that Sundance made "speculative, false or abusive

25

1    bookings" (which are undefined), this contract is dated about three years after American's issuance

2    of the debit memos to Sundance.  The court concludes that there is a genuine issue of material fact

3    as to whether Americans' "other agreements" with Plaintiffs constitute instructions prohibiting the

4    issuance of back-to-back ticketing, hidden city ticketing, and throwaway ticketing.

5        *(f)*    ***Summary of American's Instructions***

6           To summarize, the court concludes that (1) there is a genuine issue of fact as to whether

7    American's Addendum and other agreements with travel agents constitute instructions issued by

8    American pursuant to the Agent Reporting Agreement prohibiting back-to-back ticketing, hidden

9    city ticketing, and throwaway ticketing, (2) there is no genuine issue of material fact as to whether

10    American's Conditions of Carriage and Rule 100AA of its Tariff constitute instructions issued by

11    American pursuant to the Agent Reporting Agreement prohibiting back-to-back ticketing, hidden

12    city ticketing, and throwaway ticketing, and (3) there is no genuine issue of material fact as to

13    whether American's July 15, 1997 CRS posting constitutes instructions issued by American

14    pursuant to the Agent Reporting Agreement prohibiting back-to-back ticketing and hidden city

15    ticketing after that date..

16        **4.**    **Conclusion on Extortion**

17           The court also has concluded that (1) there is no genuine issue of material fact as to whether

18    the Agent Reporting Agreement clearly and unambiguously provides for the issuance of debit

19    memos to recoup payments resulting from a travel agent's failure to comply with a carrier's

20    instructions, and (2) there is no genuine issue of material fact as to whether American's Conditions

21    of Carriage, Tariff, and July 15, 1997 CRS posting constitute instructions issued by American

22    pursuant to the Agent Reporting Agreement prohibiting back-to-back ticketing, hidden city

23    ticketing, and throwaway ticketing.[7]  Consequently, the court additionally concludes that there is no

24

25          [7] As noted above, the Conditions of Carriage and Tariff prohibited these ticketing practices in

26    1993, so these instructions would only apply to ticketing practices occurring after that date.  Similarly, the
July 15, 1997 CRS posting can only be considered as instructions prohibiting back-to-back ticketing and
hidden city ticketing after that date.  Since American issued the debit memos to Sundance in 1995 and

27    Westways in 1997 and 1998, there is no genuine issue of material fact as to whether the Conditions of
Carriage and Tariff were in effect at that time (or as to whether the July 15, 1997 CRS posting was in effect

28    after that date).

1   genuine issue of material fact as to whether American, a carrier under the Agent Reporting

2   Agreement, had a contractual right to issue debit memos to Westways and Sundance, travel agents

3   under the Agent Reporting Agreement, to recoup payments from back-to-back ticketing, hidden

4   city ticketing, and throwaway ticketing, or, as the Agent Reporting Agreement allows in Section

5   VIII.E, to terminate travel agents for failing to pay such debit memos.

6       Since there is no genuine issue of material fact as to whether American had this contractual

7   right (i.e., a lawful claim) to payments resulting from the ticketing practices, American could not,

8   as a matter of law, commit extortion by obtaining such property, see Enmons, 410 U.S. at 399-400,

9   Dischner, 974 F.2d at 1516, Zaro Licensing, Inc., 779 F. Supp. at 283, Am. Computer Trust

10  Leasing, 763 F. Supp. at 1492-93, or be held liable for extortionate threats regarding that

11  contractual right.  See Rothman v. Vedder Park Mgmt., 912 F.2d 315, 318 (9th Cir. 1990) (holding

12  that it is not extortion to threaten economic harm when one has the legal right to engage in the

13  activity that one threatens).[8]

14       The court will grant American's motion for summary judgment as to Plaintiffs' claim one

15  of the SAC for civil RICO with respect to the predicate act of extortion under the Hobbs Act.

16       **c.    Lack of Probative Evidence of RICO Predicate Acts – Mail and Wire Fraud**

17       American contends that it is entitled to summary judgment on Plaintiffs' first claim for

18  violation of Section 1962(c) because, as a matter of law, American had a contractual right under the

19  Agent Reporting Agreement to issue debit memos for the recoupment of its losses from the

20  ticketing practices and, therefore, it did not make any misrepresentation to support the predicate

21  offenses of mail and wire fraud.

22       To prove mail fraud, Plaintiffs must show that American (1) engaged in a scheme to

23  defraud, (2) used the mails in furtherance of that scheme, and (3) had the specific intent to defraud.

24

25

26      [8] Since the court has already determined that there is no genuine issue of material fact as to
    whether American possessed this contractual right under the Agent Reporting Agreement, it need not
    determine whether there is a genuine issue of material fact as to American's good faith belief that it
27  possessed such a contractual right.  See, e.g., Union Nat'l Bank of Little Rock v. Fed. Nat'l Mortgage
    Ass'n, 860 F.2d 847, 857 (8th Cir. 1988) (holding that regardless of whether the defendant actually had a
28  right to the money claimed, the defendant's demands under the contract were not extortion because they
    "were motivated by [the defendant's] interpretation of the agreement").

1    <u>Miller</u>, 358 F.3d at 620.  The elements are the same for wire fraud, except Plaintiffs must prove

2    that Defendants used interstate wires in furtherance of their scheme.  <u>Manion</u>, 339 F.3d at 1156.  A

3    scheme to defraud may, but need not, be based upon affirmative misrepresentations.  <u>See, e.g.</u>,

4    <u>Forsyth v. Humana, Inc.</u>, 114 F.3d 1467, 1481-82 (9th Cir. 1997); <u>United States v. Bohonus</u>, 628

5    F.2d 1167, 1172 (9th Cir. 1980).  Misrepresentation is defined as "a false or misleading statement

6    about something, [usually] with the intent to deceive."  Black's Law Dictionary 1016 (7th ed.

7    1999).  A misrepresentation is material if "'it is made to induce action or reliance by another' or

8    has 'a natural tendency to influence or is . . . capable of influencing another's decision.'"  <u>United</u>

9    <u>States v. Somsamouth</u>, 352 F.3d 1271, 1276 (9th Cir. 2003) (quoting <u>United States v. LeVeque</u>,

10   283 F.3d 1098, 1103-04 (9th Cir. 2002)).

11        Plaintiffs present evidence that American represented to them that "it was authorized to

12   collect monies" from Plaintiffs based on a contractual right to issue debit memos to recoup

13   payments from the ticketing practices, but that "it knew, or had reason to know" that such "monies"

14   were "no more than improper penalties."  As discussed above, however, there is no genuine issue

15   of material fact as to whether American had a contractual right to issue debit memos to Westways

16   and Sundance to recoup payments from back-to-back ticketing, hidden city ticketing, and

17   throwaway ticketing.  The court has concluded as a matter of law it had such right.  It follows that

18   there is no genuine issue of material fact as to the falsity of American's representation regarding its

19   contractual right.  <u>See Miller</u>, 358 F.3d at 621 (noting that "the term 'defraud' in the mail fraud

20   statute is given its established common law meaning"); <u>Micro Motion, Inc. v. Exac Corp.</u>, 112

21   F.R.D. 2, 3 (N.D. Cal. 1985) (noting that "[c]ommon law fraud traditionally requires" both "a

22   representation of a material fact" and that "the representation is false").  The court concludes that

23   American is entitled to summary judgment on Plaintiffs' mail and wire fraud claims based on

24   misrepresentation because, as a matter of law, American made no misrepresentation regarding its

25   contractual right and authority pursuant to such right to issue debit memos to recoup such

26   payments.  <u>See Forsyth</u>, 114 F.3d at 1481-82 (holding that the district court did not err in granting

27   summary judgment on a RICO mail fraud claim when the class plaintiffs failed to "come forward

28

1  with any evidence" of the defendants' misrepresentations).[9]

2       The court will grant American's motion for summary judgment as to Plaintiffs' claim one

3  of the SAC for civil RICO with respect to the predicate offenses of mail and wire fraud.

4       **d.**     **Conclusion on Claim for Violation of Section 1962(c)**

5       Since American is entitled to summary judgment on Plaintiffs' RICO predicate offenses of

6  extortion and mail and wire fraud, which are required to establish a pattern of racketeering under

7  Section 1962(c),[10] Grimmett, 75 F.3d at 510, Turner, 362 F.2d at 1229, the court will grant

8  American's motion for summary judgment on claim one of the SAC for violation of Section

9  1962(c).

10   **2.**     **Claim Two – Aiding and Abetting Liability Under Section 1962(c)**

11      Moving Defendants contend that they are entitled to summary judgment on the second

12 claim of the SAC for civil aiding and abetting RICO because, as a matter of law, such a claim does

13 not exist.

14      Prior to Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994),

15 most courts recognized the existence of civil aiding and abetting liability under Section 1962(c).

16 See e.g., Baumer v. Pachl, 8 F.3d 1341, 1347 (9th Cir. 1993). In Central Bank of Denver, 511 U.S.

17 at 175-78, however, the Supreme Court held that there was no civil aiding and abetting liability

18 under Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)") because "the text of

19 the 1934 Act does not itself reach those who aid and abet a § 10(b) violation." Although the

20 Supreme Court found that "the statute itself resolves the case," it noted that "even if it did not, we

21 would reach the same result." Id. at 178. The Supreme Court then reasoned that "none of the

22 express causes of action in the 1934 Act further imposes liability on one who aids or abets a

23

24      [9] Since the court concludes that American is entitled to summary judgment on Plaintiffs' mail and wire fraud claims because there is no genuine issue of material fact as to whether American made any
25 misrepresentations, the court need not decide if there exists a genuine issue of material fact regarding whether American possessed a specific intent to defraud or whether Plaintiffs relied on American's
26 misrepresentation.

27      [10] Inasmuch as the court has concluded that American is entitled to summary judgment on Plaintiffs' Section 1962(c) claim because, as a matter of law, Plaintiff cannot establish the RICO predicate
28 offenses, the court need not address the issue of whether American is entitled to summary judgment because there is no genuine issue of material fact as to the existence of a RICO enterprise.

1   violation." Id. at 179.  The Supreme Court also reasoned that congressional silence on aiding and

2   abetting liability under Section 10(b) could not be interpreted to imply such liability because

3   Congress knew how to create aiding and abetting liability when it so chose but did not do so for

4   Section 10(b), Congress has not enacted a general civil aiding and abetting statute, and, in general,

5   civil aiding and abetting liability "has been at best uncertain in application." Id. at 180-88.  The

6   court rejected the arguments that a civil aiding and abetting claim could be implied from 18 U.S.C.

7   § 2 (the criminal aiding and abetting statute) and that policies favoring aiding and abetting liability

8   could trump the statutory language. Id. at 188-191.

9       Relying on Central Bank of Denver, the Third Circuit Court of Appeals ("Third Circuit")

10  held that there was no civil aiding and abetting liability under Section 1962(c). Rolo v. City

11  Investing Co. Liquidating Trust, 155 F.3d 644, 656-57 (3d Cir. 1998), abrogated on other grounds

12  as recognized in Forbes v. Eagleson, 228 F.3d 471 (3d Cir. 2001); see also Pa. Ass'n of Edwards

13  Heirs v. Rightenour, 235 F.3d 839, 842-44 (3d Cir. 2000).  The Third Circuit reasoned that "[l]ike

14  § 10(b), the text of § 1962(c) itself contains no indication that Congress intended to impose private

15  civil aiding and abetting liability under RICO." Rolo, 155 F.3d at 657.  The Third Circuit also

16  opined that Central Bank of Denver prohibited the use of 18 U.S.C. § 2 "for the imposition of civil

17  liability for aiding and abetting a RICO violation." Id.  The Third Circuit further reasoned that, as

18  in Central Bank of Denver, "the existence of cogent policy arguments in support of extending civil

19  liability to aiders and abetters of RICO violations" could not trump the statutory language of

20  Section 1962(c). Rolo, 155 F.3d at 657.  The Third Circuit concluded that it had "no authority" to

21  imply "a private cause of action for aiding and abetting a RICO violation." Id.

22      As this court noted in a prior order, Westways World Travel v. AMR Corp., 182 F. Supp.

23  2d 952, 961 (C.D. Cal. 2001), "[t]he majority of courts which have addressed the issue since

24  Central Bank have concluded that there is no basis to distinguish Section 1962(c) under RICO from

25  Section 10(b), and thus there is no aiding and abetting liability under Section 1962(c)." See, e.g.,

26  King v. Deutsche Bank AG, 2005 WL 611954, at *27-28 (D. Or. Mar. 8, 2005); Spinale v. United

27  States, 2004 WL 50873, at *6 (S.D.N.Y. 2004); In re MasterCard Int'l Inc., Internet Gambling

28  Litig., 132 F. Supp. 2d 468, 493-95 (E.D. La. 2001); Doe I v. The Gap, Inc., 2001 WL 1842389, at

1   *8 (D. N. Mar. I. Nov. 26, 2001); <u>Soranno v. N.Y. Life Ins. Co.</u>, 1999 WL 104403, at *7-8 (N.D.

2   Ill. Feb. 24, 1999); <u>In re Lake States Commodities, Inc.</u>, 936 F. Supp. 1461, 1474-75 (N.D. Ill.

3   1996), <u>abrogated on other grounds by</u> <u>Damato v. Hermanson</u>, 153 F.3d 464 (7th Cir. 1998); <u>Dep't</u>

4   <u>of Econ. Dev. v. Arthur Anderson & Co.</u>, 924 F. Supp. 449, 475-77 (S.D.N.Y. 1996).

5          The court agrees with the Third Circuit and the majority of district courts on this issue.  The

6   text of Section 1962(c) "does not in terms mention aiding and abetting."  <u>Central Bank of Denver</u>,

7   511 U.S. at 175 (internal citation and quotations omitted); <u>see also</u> <u>Rolo</u>, 155 F.3d at 657; <u>Dep't of</u>

8   <u>Econ. Dev.</u>, 924 F. Supp. at 475-76.  Moreover, the Supreme Court specifically rejected the

9   argument that the phrase "directly or indirectly," which is used in both Section 10(b) and Section

10  1962(c), can be construed to create a civil aiding and abetting claim.  <u>Central Bank of Denver</u>, 511

11  U.S. at 176-77; <u>see also</u> <u>In re MasterCard Int'l Inc., Internet Gambling Litig.</u>, 132 F. Supp. 2d at

12  494.  The statutory text of Section 1962(c) alone resolves the issue of the existence of civil aiding

13  and abetting liability under Section 1962(c).  <u>Central Bank of Denver</u>, 511 U.S. at 178.

14         Even if the statutory text alone did not resolve the issue, the result would be the same.  <u>Id.</u>

15  None of the other express claims under, or any other provision of, RICO, 18 U.S.C. §§ 1961-68,

16  contains statutory language imposing civil aiding and abetting liability.  <u>Central Bank of Denver</u>,

17  511 U.S. at 178-80.  In addition, congressional silence on aiding and abetting liability under

18  Section 1962(c) cannot be interpreted to imply such liability because Congress knew how to create

19  aiding and abetting liability when it so chose but did not do so for Section 1962(c), Congress has

20  not enacted a general civil aiding and abetting statute, and, in general, civil aiding and abetting

21  liability "has been at best uncertain in application."  <u>Id.</u> at 180-88; <u>see also</u> <u>In re Lake States</u>

22  <u>Commodities, Inc.</u>, 936 F. Supp. at 1475.  Finally, a civil aiding and abetting claim under Section

23  1962(c) cannot be implied from 18 U.S.C. § 2, and policies favoring aiding and abetting liability

24  cannot trump the statutory language.  <u>Central Bank of Denver</u>, 511 U.S. at 188-91; <u>Rolo</u>, 155 F.3d

25  at 657.  The court concludes that there is no genuine issue of material fact as to whether there exists

26

27

28

1    a private cause of action for civil aiding and abetting under Section 1962(c).[11]

2         The court will therefore grant Moving Defendants' motion for summary judgment on claim

3    two of the SAC for aiding and abetting a violation of Section 1962(c).

4    **3.    Claim Three – Respondeat Superior Liability Under Section 1962(c)**

5         American contends that it is entitled to summary judgment on this claim, as a matter of law,

6    because it cannot be held liable for the Section 1962(c) violations by the ARC, American Eagle,

7    and Sabre under a respondeat superior theory when Plaintiffs never brought any Section 1962(c)

8    claims against the ARC, American Eagle, or Sabre.

9         Under Ninth Circuit precedent, "an employer that is benefitted by *its employee or agent's*

10   *violations of section 1962(c)* may be held liable under the doctrines of respondeat superior and

11   agency when the employer is distinct from the enterprise." Brady v. Dairy Fresh Prods. Co., 974

12   F.2d 1149, 1154 (9th Cir. 1992) (emphasis added).  While the Ninth Circuit recognizes respondeat

13   superior liability under Section 1962(c) under certain circumstances, such liability requires the

14   employee or agent to have committed a violation of Section 1962(c).  See id.; see also Competitive

15   Techs., 286 F. Supp. 2d at 1145 ("A master or other principal may be liable to another whose

16   interests have been invaded by *the tortious conduct of a servant or other agent*, although the

17   principal does not personally violate a duty to such other or authorize the conduct of the agent

18   causing the invasion.") (quoting Restatement (Second) of Agency § 216 (1958)) (emphasis added).

19   Plaintiffs only brought a claim for violation of Section 1962(c) against American.  Since Plaintiffs

20   did not bring any claim for violation of Section 1962(c) against the ARC, American Eagle, or

21   Sabre, Plaintiffs cannot hold American liable for Section 1962(c) violations committed by the

22   ARC, American Eagle, or Sabre.  See Brady, 974 F.2d at 1154.  The court concludes that there is

23   no genuine issue of material fact as to whether American is liable for violating Section 1962(c)

24

25

26

27   [11] Even if a civil aiding and abetting RICO cause of action existed, Plaintiffs' aiding and abetting
     RICO claim would likely fail as a matter of law because American is entitled to summary judgment on
     Plaintiffs' substantive RICO claim. Cf. United States v. Garcia, 400 F.3d 816, 819 n.2 (9th Cir. 2005)

28   (stating that criminal aiding and abetting liability required proof "that someone committed the underlying
     substantive offense") (quoting United States v. Delgado, 357 F.3d 1061, 1065-66 (9th Cir. 2004)).

1   under a respondeat superior theory.[12]

2        The court will grant American's motion for summary judgment on claim three of the SAC

3   for respondeat superior liability under Section 1962(c).

4   **4.     Claim Four – RICO Conspiracy Under Section 1962(d)**

5        Moving Defendants contend that they are entitled to summary judgment because, as a

6   matter of law, a RICO conspiracy claim cannot survive summary judgment if a court grants

7   summary judgment on a substantive RICO claim.  Moving Defendants are correct that when a court

8   grants summary judgment on a substantive RICO claim, a RICO conspiracy claim fails as a matter

9   of law.  See Howard v. Am. Online, Inc., 208 F.3d 741, 751 (9th Cir. 2000) ("Plaintiffs cannot

10   claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive

11   violation of RICO."); Rotec Indus., Inc. v. Mitsubishi Corp., 163 F. Supp. 2d 1268, 1280 (D. Or.

12   2001) ("Because the substantive RICO claim against Tucker failed to survive summary judgment, I

13   also grant summary judgment against the [RICO] conspiracy claim.") (relying on Howard, 208 F.3d

14   at 751).  The court will therefore grant Moving Defendants' motion for summary judgment on

15   claim four of the SAC for RICO conspiracy in violation of Section 1962(d).

16   **5.     Claim Five – Breach of Contract**

17        American and American Eagle contend that they are entitled to summary judgment on claim

18   five of the SAC for breach of contract because, as a matter of law, American had a contractual right

19   under the Agent Reporting Agreement to issue debit memos to travel agents, including Plaintiffs, to

20   recoup payments from the ticketing practices by the agents and the agents' customers.

21        As noted above, Virginia law is the governing law under the Agent Reporting Agreement.

22   The elements of a breach of contract cause of action under Virginia law are "(1) a legal obligation

23   of a defendant to the plaintiff, (2) a violation or breach of that right or duty, and (3) a consequential

24

25

26        [12] Even if American could be held liable for Section 1962(c) under a respondeat superior theory, Plaintiffs' respondeat superior theory would likely fail as a matter of law because American is entitled to summary judgment on Plaintiffs' substantive RICO claim. Cf. Niederreuther v. Schifter, 1998 WL 409876,

27   at *2 (N.D. Cal. July 14, 1998) ("The rule is 'established,' however, that 'where the liability of an employer in tort rests solely on the doctrine of respondeat superior, a judgment on the merits in favor of the

28   employee is a bar to an action against the employer.'") (quoting Hilts v. County of Solano, 71 Cal. Rptr. 275, 286 (1968)).

1    injury or damage to the plaintiff." <u>Brown v. Harms</u>, 467 S.E.2d 805, 807 (Va. 1996).

2          Plaintiffs contend that American and American Eagle breached the Agent Reporting

3    Agreement when American issued debit memos to them to recoup payments from the ticketing

4    practices.  Because the court has already concluded that there is no genuine issue of material fact as

5    to whether American had a contractual right to issue debit memos to Westways and Sundance to

6    recoup payments from the ticketing practices, it follows that, as a matter of law, American did not

7    have "a legal obligation" to Plaintiffs to refrain from issuing debit memos to Westways and

8    Sundance to recoup payments from the ticketing practices.  Without such "a legal obligation,"

9    American cannot, as a matter of law, be liable to Plaintiffs for breach of contract under Virginia

10    law.  <u>See, e.g.</u>, <u>Buck v. Jordan</u>, 508 S.E.2d 880, 884 (Va. 1998).

11          The court will grant American's and American Eagle's motion for summary judgment on

12    claim five of the SAC for breach of contract.

13    **6.**     **Claim Six – Unjust Enrichment**

14         .Moving Defendants assert that they are entitled to summary judgment on claim six of the

15    SAC for unjust enrichment because, as a matter of law, an action for unjust enrichment cannot lie

16    when the parties are in a contractual relationship.  Moving Defendants are correct that no action for

17    unjust enrichment lies where an express contract governs the relationship of the parties.  <u>See</u>

18    <u>McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.</u>, 339 F.3d 1087, 1091 (9th Cir.

19    2003); <u>Acorn Structures, Inc. v. Swantz</u>, 846 F.2d 923, 926 (4th Cir. 1988); <u>Vollmar v. CSX</u>

20    <u>Transp., Inc.</u>, 705 F. Supp. 1154, 1176-77 (E.D. Va. 1989); <u>Lance Camper Mfg. Corp. v. Republic</u>

21    <u>Indem. Co. of Am.</u>, 51 Cal. Rptr. 2d 622, 628 (Cal. Ct. App. 1996).  Since the Agent Reporting

22    Agreement governs Plaintiffs' and Moving Defendants' relationship with each other, the court

23    concludes that Plaintiffs' unjust enrichment claim fails as a matter of law.  The court will grant

24    Moving Defendants' motion for summary judgment on claim six of the SAC for unjust enrichment.

25    **7.**     **Claim Seven – Declaratory and Injunctive Relief**

26          Since the court has already concluded that Moving Defendants are entitled to summary

27    judgment on all of Plaintiffs' substantive claims, the court concludes that Moving Defendants are

28

1  entitled to summary judgment on claim seven for declaratory and injunctive relief.[13]  See Hoeck v.

2  City of Portland, 57 F.3d 781, 787 (9th Cir. 1995); New.Net, Inc. v. Lavasoft, 356 F. Supp. 2d

3  1090, 1115 (C.D. Cal. 2004).  The court will grant Moving Defendants' motion for summary

4  judgment as to claim seven of the SAC for declaratory and injunctive relief.[14]

5                                                         **VI.**

6                                                 **DISPOSITION**

7  ACCORDINGLY, IT IS ORDERED THAT:

8           Moving Defendants American Airlines, Inc.'s, AMR Corporation's, and American Eagle

9           Holding Corporation's motion for summary judgment on Plaintiffs Westways World

10          Travel, Inc.'s and Sundance Travel Service's Second Amended Complaint pursuant to

11          Federal Rule of Civil Procedure, Rule 56(c) is GRANTED.

12

13   ____9/13/05____                    _Robert J. Timlin_____
        DATE                            JUDGE, UNITED STATES DISTRICT COURT

14

15

16

17

18

19

20

21

22

23

24

---

25          [13] The court notes that in a prior order in this action it concluded that injunctive relief is not

26  available under civil RICO, but that "there is no legal barrier to obtaining declaratory relief under" civil
    RICO. Westways World Travel, Inc., 218 F.R.D. at 242.

27          [14] Because the court concludes that Moving Defendants are entitled to summary judgment on all

28  Plaintiffs' state law claims in the FAC, it need not determine whether such claims are preempted by the
    Airline Deregulation Act of 1978, 49 U.S.C. § 41713(b)(1).